We'll begin with JCorps International and that has three lawyers. We have Mr. Reinitz, am I pronouncing that right? That's correct, Your Honor. Okay, Mr. Reinitz for the appellant and Mr. Sandick and Mr. Fishman for the appellee. Are Mr. Sandick and Mr. Fishman on the line? I'm here, Your Honor. Thank you. Good morning. Good morning, Your Honors. I'm here as well. Good morning. Okay, so with that then we've got 12 minutes per side allotted for this argument. Mr. Reinitz, you've requested three minutes of rebuttal. So the floor is yours. Thank you, Your Honor. May it please the court. My name is Ariel Reinitz for plaintiff appellant JCorps International. The district court erred in dismissing this case for lack of personal jurisdiction. Specifically, the district court overlooked the fact that the claims in this case arise out of conduct the defendants specifically directed towards this forum, which is sufficient to exercise personal jurisdiction over them. In the proceedings below, both sets of defendants, that's Mr. Blumenthal and the One Day Entity based in Israel and the Schusterman Foundation and various related individuals located in Oklahoma and Maryland, moved to dismiss JCorps' complaint under both Rule 12b-6 for failure to state a claim and Rule 12b-2 for lack of personal jurisdiction. The district court in its ruling considered and rejected all the arguments presented for dismissal under Rule 12b-6, finding the underlying claims were properly pled. Well, since you mentioned that, Mr. Reinitz, I just wonder if you could enlighten me a little bit about what's the point of this lawsuit. As I understand it, the plaintiff is organized as a not-for-profit corporation. Is that correct? It's a former not-for-profit. That's correct. Well, former not-for-profit. I mean, under New York law, it's just a plain corporation, I guess. Is that the idea? That's correct, Your Honor. The not-for-profit idea has to do with the IRS. That's correct, Your Honor. So is it now making profits? Does it intend to make profits? Not necessarily, Your Honor. Well, so what I'm wondering about is this. Here's an outfit whose raison d'etre, as I understand it, is to encourage volunteerism and not to make money and to get people involved in, I don't know if it's specifically Jewish charities, but charities at any rate, and I'm wondering what trade secrets you could have or how you could be injured by having your trade secrets stolen, if that's the right word, by an entity in Israel trying to do the same thing. One would think that an organization devoted not to profit but to encouraging charitable activities would be delighted if somebody else uses the same good, exciting, innovative techniques to do the same thing in another country. What is the deal here? That's a good question, Your Honor, and I think in particular the not-for-profit context, whether or not it's applicable to J-Corps specifically, makes the issues here even more poignant because all that an not-for-profit organization would have in terms of tangible assets would be, again, in this context, the trade secrets, the proprietary information that it generates, its relationships with its participants. In this case, again, there are a number of technologies that the organization developed that gave it sort of a unique edge, as it were, or a unique advantage. But so what? Why are you competing with these guys? Isn't everybody in the same ballgame? Everybody's trying to get volunteers to go to work and do these good deeds. So how are you hurt? Suppose they solicit the same donors that you solicit. They're working in Israel. You're working over here. Who cares? In this case, Your Honor, specifically, the issue became when you have an organization, in this case, 1Day, that is presenting itself to the public, to the same body of users as, again, essentially, a carbon copy. That, not hypothetically, but actually has had effects in terms of J-Corps continuing its mission because it created confusion. It created a lot of disconnect between J-Corps and its members when they weren't sure, is this J-Corps? This 1Day organization, is it J-Corps? Is it not? Are they real affiliated? And that created a lot of disconnect between J-Corps and its members and ultimately affected its ability to continue its mission. Okay. Well, sorry to eat up a lot of your time with that. I was just puzzled. So please go ahead. It's a very simple question. Thank you, Your Honor. Specifically, in its brief order, the district court concluded it could not exercise personal jurisdiction over the defendants because, quote, neither the tort nor the effects of the tort took place in New York. That's at A122 in the appendix. In doing so, the district court focused almost exclusively on the fact that aspects of the defendants' joint activities occurred in Israel, ignoring the fact that other elements, which give rise to the causes of action in this case, were intentionally directed by them towards New York. But where does it say that in the complaint? I'm sorry, Your Honor? Where does it say that in the complaint? Where are the New York references in the complaint? The references to New York in the complaint are, number one, the hacking activities by Mr. Blumenthal on 1Day, which were directed towards J-Corps' accounts. Well, that's a LinkedIn account, right? That's correct. Any indication where the LinkedIn servers were and whether the hackers knew that they were in New York? LinkedIn specifically is not reflected in the record. What is reflected in the record elsewhere is that the defendants knew that J-Corps' participants, again, a large part of its participant base, which we're alleging was targeted, are based in New York. They also were well aware of J-Corps' activities, long-time presence in New York and its activities there. Well, your presence in New York isn't the point, right? If there's anything we know from the Supreme Court about personal jurisdiction, it's that. What matters is, going back first to the hacking, is there any non-conclusory allegation of hacking other than about LinkedIn? LinkedIn is the primary allegation, your honor. That's correct. Okay, so is there any, I think Judge Sullivan's question was, is there anything in the complaint about the location of LinkedIn's data or the data that was allegedly taken? I'm not sure there's even an allegation I think was taken, but that was accessed of where that took place. In terms of the servers themselves, no. What I'll note is that case law and many other courts who have considered this issue do consider the accounts as they are associated with a particular entity to be, you know, the data, the underlying data and the context to be considered as that hacking activity being directed towards the location of the entity. And other than the hacking activity, you say that it was known to one day that a lot of your participants and donors and whoever were in New York. Is there any allegation to that? Is there any allegation in the complaint, forget what they knew, to where your donors and participants are, or any indication of which donors and participants were solicited by them wherever located? That, in terms of the specific New York reference, that's further added into the record through an affidavit by Mr. Thieme, the CEO of J-Corps. But the affidavits seem to just basically state conclusively that they caused the injury in New York, that there are participants and potential participants in New York. And you think that's enough? There's that, and as well as the, we submitted several pieces of evidence directly from one day that demonstrate their targeting, you know, they had publicly announced and were publicly describing activities that they were directing towards the U.S. and or towards New York or New York-based organizations in terms of partnerships and other things. Is there any specific allegation in the complaint or the a single such participant or donor or anybody connected with your organization that was solicited in New York or elsewhere, for that matter? Those specific details were added in our second amended complaint that we submitted. We requested leave to submit and subsequently, and that is in the record. Well, wait, in the proposed amended complaint, I saw that many of the conclusory allegations had the words in New York added, which had not been added before that. But I had a slightly different question, which was, was there any specific allegation identifying anyone that you're aware of who was solicited, even if not in New York, in the United States, anywhere? Yes, yes, your honor. In the proposed amended complaint, there are a number of organizations that are identified by name that are, you know, we're, as far as we know and understand, are New York-based organizations that the trade secrets that were misappropriated were used to solicit. Those are... Well, that was Birthright Israel and Onward Israel. That's right, and those are in the proposed amended complaint. That's correct, your honor. All right, well, I see that we're, the clock's gone red. You've reserved three minutes for rebuttal, so why don't we move over now to Mr. Sandick. Mr. Sandick, you're going first for your team. That's right. Thank you, your honor. Okay, you have six minutes. Thank you. Good morning. May it please the court. My name is Harry Sandick. I'm a partner at Patterson, Belknap, Webb & Tyler, and I represent the Schusterman Family Foundation, which is a non-profit philanthropic organization located in Tulsa, Oklahoma. I also represent three foundation executives, none of whom are New York persons. The court should affirm the district court's dismissal of the amended complaint for lack of personal jurisdiction. As I said, none of my clients are New York persons, and none of them are alleged in the complaint, in any edition of the complaint, to have engaged in activity in New York that is relevant to the allegations against them. Indeed, the plaintiff has already filed his lawsuit anew in the northern district of Oklahoma, where there is general jurisdiction over the foundation, but there's no jurisdiction here. The only allegations in the amended complaint that concern our client involve three events that occurred not in New York. They're not alleged to have occurred in New York. As we said in our papers below, they occurred in Israel. They talk about us orchestrating a Seder dinner for a holiday, 2 B Shabbat, and two conferences, all of which are in Israel. There's a stray allegation somewhere in the complaint to us once holding an event in Tarry Town, but that allegation is not connected in any way to the trade secrets case. The only thing that is connected to New York is that it happens to be where Ari Taman and J Corp, the plaintiffs, are located, and so it points essentially to its own injury, but that is not enough under Walden v. Fiore. It's not enough under this court's decision in Waldman. In addition, the district court correctly declined to allow the plaintiff to take a third shot at this, to file another second amended complaint. They had many opportunities to present their allegations and the district court, even though it wasn't required to consider the second amended complaint, it did and cited a case about futility in the course of denying the motion to amend. So the denial of leave did not prejudice the defendant here, I'm sorry, the plaintiff here, because of the futility conclusion and remand would be equally futile. We know what Judge Hallerstein has said. He studied this complaint and he cited the Chao case to indicate his view that even as amended, there just wasn't enough here. I'm happy to answer questions the court may have, but otherwise we would be prepared to rest on our papers and allow Mr. Fishman to proceed. Well, I guess maybe I'll ask you about the Seder because I thought the allegation was that it was designed to recruit New York-based participants and to support other activities that are alleged to have been connected to this scheme. So I'm not sure why it is you're saying that there's not a sufficient connection. Sure. So the allegation, very general in nature, seems to be essentially that some of the people who may have attended this Seder dinner in Israel, which was organized in Israel, may have come from New York or have been people whose New York residence may have been known to the foundation or to One Day, but that is not purposeful availment. It doesn't say that our client entered the jurisdiction to do anything here. The notion that if you have an event and people from New York attend the event, you can then have jurisdiction even though the event is not in Israel. I mean, sorry, it's not in New York, but in Israel. And even if the organizers of the event are from Oklahoma and from Israel. Well, I think the allegation, I'm sorry, Mr. Senator, uses information that was stolen from JPOR and they then targeted participants in New York and then had them come to Israel for a Seder that enabled them to further the scheme. Is that I think it is accurate that an event was held. I don't know of any specific allegation about what was done to target or solicit. Was this done through contacts with people in New York? Was this done through people from the foundation visiting New York? Was it done through agents and other organizations in New York? None of that is alleged here. And this is an Oklahoma foundation that, sure, as the plaintiff says in his second amended complaint, there are some people in New York who also traveled to Israel that are interested in issues of Jewish philanthropy. But it doesn't seem that targeting those without explaining what was done and how it was done should be enough to bring someone into court in New York that has no connection to the jurisdiction. So if they could have explained, I suppose, what they meant by targeting, I could give a more substantive response. But does targeting just mean putting a post on social media? Does targeting mean sending an email blast to different people in organizations and saying, if you're in Israel and want to target? And that's the defect here with respect to personal jurisdiction. And they've had now multiple chances to explain what we actually did, what our connection is to New York. And Mr. Sandik, what was the purpose? Is there an allegation about what the purpose of this Seder was? I take it it was either a fundraiser or something run by one day. It wasn't just people sitting around celebrating the holiday, I take it. Or am I wrong? Well, the 2B Shabbat, as I understand it, is a holiday to celebrate the need for, or at least how it's been observed in recent years, sort of environmental caretaking. And so my understanding based on that is it would have been people who wanted to meet and talk about ways to engage in environmental caretaking consistent with both non-religious and religious motivations to engage in that. I don't think there's any profit-making element here. The Schusterman Foundation is well-founded. They're not looking to steal anything from anyone. They don't actually allege that we took anything. But what they allege, I'm sorry to interrupt, what they allege is that this event caused many participants to cease or curtail their relationship with JCORP. So in other words, they induced these folks to break ties with JCORP and to establish ties or deeper ties with your client. Well, they don't allege, yes, that's what they say, Your Honor, in the complaint. They don't allege, however, how this was done or what was said or whether we did anything that actually changed the future for JCORP as opposed to just having an event and people showed up, and some of them were from New York. That's essentially their allegation. And they say the action that they're alleging when they talk about targeting and recruiting is very vague and not sufficient in the district court's view, which we agree with, to bring this Oklahoma entity into the courts of New York. What you're essentially saying, Mr. Sandik, it seems to me is that although I don't know a case where we've explicitly said this, but it seems fairly obvious that the Twombly standard applies when you're assessing a 12b-2 motion on the face of the complaint, that the allegations have to have sufficient particularity and concreteness to be vice a level of plausibility. Yes, Your Honor. I don't know of a specific case that applies the standard in this context, perhaps because mostly personal jurisdiction is alleged in a more straightforward way. You sue someone in New York for something that they obviously did in New York rather than trying to ask courts to piece together vague allegations. But we do agree that there is essentially a plausibility or a specificity problem with the personal jurisdiction here. And what the plaintiff is asking is to say, let's go back to Judge Hellerstein. Let's file a fourth amended complaint, a fourth complaint rather, even though we have a case against the Schusterman Foundation in Oklahoma, which is where they're located and where the Schusterman Foundation is amenable to sue for anything. Let that case proceed. Don't continue to force a case that is not evidently about events in New York to occur in New York. All right. Thank you, Mr. Sandek. We'll now hear from Mr. Fishman. Thank you, Your Honors, and may it please the court. My name is Ben Fishman from Yankwit LLP, and I represent One Day and Mr. Blumenthal. This is a case about a small Israeli nonprofit that operates exclusively in Israel. And because of that, the case belongs in Israel, if it belongs anywhere. There's three main points I wanted to make before, well, happy to take your questions at any time. But the three points I wanted to make, I'll actually start, Judge Lynch, with the question you just asked about Twombly. I don't think I've seen a case that says that Twombly specifically applies, but there are cases that say that allegations asserted in support of a prima facie case of the Zeni case cited in our brief. And the Troma Entertainment case also says that the allegations need to be non-speculative. So language like that has been used in Second Circuit decisions regarding 12b2 motions. In this case, there was, I mean, there was a lot more added to the record, right? Well, maybe not a lot more, but there was other stuff added to the record. There were affidavits. Correct. There are affidavits. Yeah. And on the affidavits, there are two affidavits submitted by my client, Mr. Blumenthal, which actually provide a lot of necessary context here. As your honors noted, there is also an affidavit submitted by Mr. Taman, but it simply says, concludes really, you know, that donors and volunteers in New York were somehow affected. But the affidavits provided by Mr. Blumenthal show a couple of important things. Most importantly, that one day Blumenthal never had any intention of harming J-Corps in New York or at all. But Mr. Fishman, if we're going to consider these affidavits and turn this into a fact issue, we could do that. But then I suppose it's a summary judgment motion. And then we've got competing affidavits and we've got something other than what the district court did. We could also, or the district court could have limited jurisdictional discovery and then have a the various facts at issue. But I thought that the district court handled this basically by saying the complaint is insufficient. Isn't that right? Well, your honor, affidavits are often considered on 12b2 motions and you're correct that it's possible, of course, to have an evidentiary hearing, but also many 12b2 motions are decided either with or without affidavits. So that's... Well, they could be decided with affidavits, but then wouldn't it be a summary judgment standard that we'd be applying at that point? Well, I think in this case, I guess I'm not sure that the district court specifically said exactly what it was relying on, whether it was just the allegations or the affidavits. But I would say that in this case, J-Corps had the opportunity to submit facts into the record. It submitted the conclusory affidavit of Mr. Taman and it then relied on some social media postings on the internet, which my client, Mr. Blumenthal, provided appropriate context to. So just to correct one statement that Mr. Reinitz made, they talk about sort of establishing partnerships with New York entities. Mr. Blumenthal made clear that what that's about is they allow New York groups such as Birthright to bring people to Israel and then they give them an opportunity to volunteer in Israel. I take it it's not a trade secret that someone interested in sponsoring Jewish volunteerism in Israel would contact the Birthright people in the United States. Exactly. I've never been inside any of J-Corps' computers, but I know all about Birthright. I have nephews and nieces who've taken the trips and it's a pretty well-known organization. Yeah, that's correct, Your Honor. And that actually leads to another point that even if Birthright is a New York organization and there's some relationship between One Day and Birthright that allows Birthright people not in New York, in Israel, to participate in One Day events, at no point does J-Corps allege, including in the second amended complaint, that any trade secrets were used in order to forge that relationship. So there's really no, even if that's some kind of very thin New York contact, there's no allegation that it's connected to the alleged torts, which is necessary for specific jurisdiction. So I think they've done, even in the second amended complaint, to the extent that we'll consider it. They've done nothing other than assert conclusory, speculative allegations that somehow J-Corps' standing was harmed in New York. Unclear how that could have happened. Again, they don't name any specific volunteers. They don't name any specific donors. It doesn't really make any sense. Everything that One Day and Blumenthal did was in Israel and there's no dispute about that. So I don't think an evidentiary hearing would be necessary to resolve those issues. Mr. Fishman, why would we not consider the second amended complaint? That's one of the issues on appeal, isn't it? Of course, Your Honor. Yeah. I mean, so there's a threshold issue of whether or not the attempt to amend the complaint was proper, which is addressed in our briefs. J-Corps asked to amend the complaint at the end of their brief. They didn't actually provide the proposed amendment and the case was dismissed without allowing for that amendment. And that's discussed in the briefs, including the Tamoxifen case. But even putting that aside, I don't really want to get into that dispute. I mean, as the district court found, even if we take the second amended complaint into account, it's insufficient. It's insufficient to state a claim and the same jurisdictional problems exist because, again, there's no dispute that everything that One Day and Blumenthal did that's relevant to this case happened in Israel. And any allegation that New York owners or New York volunteers heard about it and somehow were disappointed in J-Corps, it's speculative. It's gloosery. Even if J-Corps volunteers heard about One Day, I mean, even if J-Corps is still operating after 2013, which is a big question, but even if it was and they still had volunteers and they're in New York and they fly to Israel to go do something with One Day, there's no allegation that they stayed there and never came back. I mean, they could have come back and volunteered for J-Corps. There's no harm to J-Corps here. So Your Honor, if you'll permit me, just one last point. Under both the long arm statute and the due process clause, the burden on my clients must be taken into account. There's different language used under those two standards, but it essentially boils down to that. And in this case, if the case is permitted to go on, if my clients have to come defend themselves in New York, it's going to be fatal to One Day. It's going to, you know, in light of the unprecedented impact that the pandemic has had, they're going to have to close their doors. I realize that's not on the record. That's me speaking based on my conversations with my clients, but I think it's important for the court to know that. And that's relevant to the jurisdictional analysis under both the Ingram v. Carroll. But if it's not in the record, we should just take your word for it. And it's important for us to weigh that in the scale here. Yeah. I mean, what is in the record, what is in the record is that there's no international, no engagement in international commerce, which is a requirement under the long arm statute. Okay. But I wish that's the thing that's great. That's where I thought you were going, Mr. Fishman, is that under the New York statute, you would have to derive significant revenues from interstate commerce, even if you caused effects in New York. And it's not clear to me what that even means in the case of a not-for-profit, or whether anything, any money that you get in counts as revenue from interstate international commerce. Well, exactly. That's exactly right. And your honor, I was sort of conflating the long arm and, you know, the due process standard. They both require that sort of a similar analysis. But yes, donations from, you know, even American donors and donors elsewhere don't count as international commerce, certainly not substantial international commerce. And that's basically what this court said in the Pinchione case, which quotes another case, Ziegler v. Ziegler, and we have it in our brief, and it just states commerce is buying and selling goods. You know, it's not just receiving things of value, including, you know, infusions of capital from the United States. The New York Court of Appeals found that doctor referrals, which is something valuable, don't count as commerce. So it's clear commerce is buying and selling goods, and my client is a non-profit. It just doesn't do that. So the long arm statute standard cannot be met. Okay, so thank you, Mr. Fishman. We'll now hear from Mr. Reinitz for three minutes. Thank you, your honor. I just want to return for a moment to the issue of the hacking. I know we, both of the defendants spent most of, if not all their time, you know, addressing the Seder dinner. You know, certainly that was the thrust of their briefs, as well as to focus sort of exclusively on the activities that they conducted, you know, by all admissions, you know, in Israel. But what they don't address and what the district court, we believe, overlooked was the fact that, you know, a substantial part of those activities also involved, and again, that's where Mr. Blumenthal's relationship with J-Corps comes into play and the social media technologies and strategies and other techniques that he was privy to. J-Corps' contact lists came into play in terms of them promoting those activities, not just within Israel, but specifically to New York, whether it's to recruit New York participants, to recruit New York donors, to recruit New York, you know, partners or prospective partners. That's also where the hacking claims, again, that we discussed earlier come into play, you know, specifically. Is there anything new? Are there new facts alleged in the second amendment complaint concerning the hacking that aren't already in the first complaint? The facts that are alleged in the second complaint with respect to the hacking, Your Honor, document additional facts in terms of the, I would say, the outcome of the hacking. In other words, based on the hacking, that's, I'm looking, A-167 through about 169, 170 in the record. Subsequent to the hacking, we've documented in the second amendment complaint how the one-day organization was able to secure several, you know, in short order, you know, within a few months after a hacking, they had launched partnerships with several New York-based organizations. They, I think, had contracted with one or two New York organizations publicly. And, again, as we're alleging in the second amendment complaint, we believe that that, you know, was at least in part facilitated by, you know, the hacking that they did and the information that they were able, I'm sorry. Could I come back, Mr. Marantz, to where Mr. Stickman ended up? What, how do you establish that either of these entities derived substantial revenues from interstate or international commerce? With respect to one-day, the, under Rule 4K2, I mean, if we're, if we consider the federal long- Wait, wait, wait. Let's take things, I'm sorry, let's take this one at a time. We've been talking almost exclusively about the New York long-arm statute for now. So we can talk about 4K2 separately. Let's start with the New York statute. Yes, Your Honor. With respect to Blumenthal and One Day, who I think are the only, I don't believe the Schusterman Foundation dispute that they're an international organization. They're obviously- It's not about being international. The standard under the statute is substantial revenues from interstate or international commerce. That's correct, Your Honor. What is the revenue from commerce that you're relying on? With respect to One Day, that would be several things. Number one, they're documented partnerships with numerous U.S. and or New York-based organizations. A partnership is revenue? It can be, certainly. The existence of a partnership constitutes substantial revenues? I mean, if I have partners and a business, that doesn't, I could still go bust. Certainly. But all right. So that's one thing you're relying on, I guess. But don't we have cases in New York saying that commerce means buying and selling things? Does that even apply if this partnership does not buy and sell things? Yes, Your Honor. We've said in our brief, I think one if not more cases where the New York courts applying the New York long-arm statute specifically note that revenue in and of itself is not an indicator, is not the be-all and end-all of commerce because you can have, let's say, a startup company may be losing money. They may not be, but can be involved in substantial commercial activity, can be considered successful by many. But the question is whether this is commercial activity, isn't it? That's- You have a case that says that a non-profit soliciting donations constitutes income from commerce? The case law, like I said, Your Honor, does address the issue of dollars. You know, a balance sheet in and of itself doesn't tell the whole story. I didn't ask about a balance sheet. I asked about solicitations of donations or receipt of donations by a not-for-profit that does not engage in buying and selling. I'm not familiar with a specific case on point. I also will note that the cases in New York note that this issue in particular is one that has to be resolved in discovery because on this issue of businesses' internal workings and their revenues, that's something that a party, the other party on the other side will not be privy to without discovery. Okay. I think I understand your position. Just to return for a moment to the hacking claims, again, that is something that we've noted. All the case law that we've cited and all the case law that I'm familiar with finds that hacking, even when it's initiated by foreign parties, when it's undisputedly directed towards the U.S. or towards New York, courts have almost universally found personal jurisdiction. I'm not familiar. Notably, Bloom and Bella one day in their brief can't find a single authority to support the suggestion that a foreign hacker that hacks into the United States or into New York in this case should be immune from jurisdiction in courts, especially when, again, the... Is there any allegation in the complaint linking the Shusterman Foundation or the Shusterman defendants, any of them, to the hackery? No, your honor. No, those allegations are strictly with respect. There are allegations, to be clear, in terms of, let's say, the trade secrets that were obtained, subsequent activities, but no, the Shusterman Foundation is not alleged to have been involved in the hacking. I should note, by the way, something I learned yesterday about the way the Zoom works. The clock sometimes seems to freeze. It is not that the clock has been stopped. I assume it's running somewhere. It's that the frame has frozen. So, no one pushed a button that said that, you know, the way sometimes happens in collective bargaining negotiations, that we're stopping the clock at six seconds before midnight. I think that's a polite way to say wrap it up then, Mr. Reynolds. Thank you very much. We need to wrap it up. Thank you, your honor. Accordingly, we ask the court to reverse and remand to the district for further proceedings. All right. Well, thank you all. Very well argued. We will reserve the decision.